# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**KEITH JACKSON,**
    **Plaintiff,**

  **v.**           **Case No. 12-CV-00058**

**DR. SCOTT HOFTIEZER,**
**BETH DITTMANN,**
**RN JEN KOEHLER,**
**RN KIM LEBRECK, and**
**SGT. HELLER,**
    **Defendants.**

## DECISION AND ORDER

Plaintiff is proceeding on Eighth Amendment medical care claims against each of the defendants in his or her individual capacity. These claims relate to the medical care plaintiff received for gastrointestinal problems he suffered while an inmate at Dodge Correctional Institution. Now before me is defendants' motion for summary judgment.

### I. BACKGROUND[1]

Plaintiff Keith Jackson is a state prisoner who was housed at Dodge Correctional Institution ("Dodge") at all times relevant to this case. Defendant Scott Hoftiezer, M.D., was employed by the Wisconsin Department of Corrections (the "DOC") as a physician at Dodge. Defendant Beth Dittmann, R.N., was employed by the DOC as the Nursing Supervisor in the Health Services Unit (the "HSU") at Dodge. Dittmann has not provided

---

[1] The facts are taken from defendants' proposed findings of fact (Docket #68), plaintiff's sworn response to defendants' proposed finding of fact (Docket #94), and defendants' reply to plaintiff's response to defendants' proposed findings of fact (Docket #111) to the extent each assertion is supported by admissible evidence.

any direct care to plaintiff that is part of this action. Defendant Jennifer Koehler, R.N., was employed by the DOC as a Nurse Clinician 2 at the HSU at Dodge. Defendant Kim LeBreck[2] was employed by the DOC as a certified nursing assistant ("CNA") at the HSU. Defendant Timothy Heller was employed by the DOC as a correctional sergeant at Dodge.

Inmates at Dodge who require non-emergency medical attention must submit a health services request form ("HSR") to the HSU. Dittmann does not triage the HSRs as part of her job duties as HSU Manager. HSRs are triaged and responded to by nursing staff on a daily basis. An inmate who thinks he needs to be seen right away may go to sick call, where nurses assist inmate patients, provide treatments and schedule follow-up appointments according to approved protocols and clinical priorities. If inmates think they are experiencing an emergency, they are directed to alert unit staff.

DOC policy governs how practitioners obtain approval to refer inmates offsite for non-emergency care. If the physician determines that an inmate has a medical issue that would require him to go offsite to see a specialist or to receive a procedure that cannot be performed at the institution, the physician must submit a Class III request to the Bureau of Health Services. If the Class III request is approved, the HSU staff make an appointment for the inmate to be seen offsite by a consulting physician.

A consulting physician may recommend a course of treatment for an inmate to the institution's treating physician. The treating physician is not bound by the recommendations and may adopt or reject any or all of the recommendations in light of the treating physician's own medical judgment and in light of security and other institutional concerns.

---

[2] Defendant Kim LeBreck is now known as Kim Van Haren. I will continue to refer to her as LeBreck to avoid confusion.

Plaintiff arrived at Dodge on August 15, 2007. During an intake screening/medical history, a nurse noted that plaintiff had a history of stomach problems or ulcer. Plaintiff had a gastric bypass in September 2004 to correct his gatroesophalgeal reflux disease ("GERD") and a hiatal hernia, but plaintiff said that the surgery had not worked. The nurse noted plaintiff's prescription for Prilosec and continued that and his other medications.

Signs and symptoms of GERD include acid reflux and heartburn. These are common digestive conditions that affect many people, but when they occur at least twice each week or interfere with daily life it is called GERD. Treatments for GERD include medications and surgery, but not all people with this disease require treatment and only a few people need surgery. Most people can manage the discomfort of GERD with lifestyle changes and over-the-counter medications.

Plaintiff received regular periodic treatment for his GERD, as well as other medical conditions, while at Dodge. In 2007, plaintiff was treated primarily by medical professionals who are not defendants to this case. His medications were adjusted, and he was given a prescription for a wedge to elevate his head while he slept, or extra pillows if no wedge was available.

Plaintiff saw Dr. Hoftiezer for the first time on January 2, 2008, and complained of constant GERD despite medications. On exam, Dr. Hoftiezer found that plaintiff was in no acute distress and his vital signs were stable. In contrast, plaintiff avers that he cried out in pain when Dr. Hoftiezer pressed on his stomach during this visit. Dr. Hoftiezer confirmed plaintiff's GERD diagnosis and made a plan to maximize medical therapy. To that end, Dr. Hoftiezer increased plaintiff's medications.

Plaintiff saw Dr. Hoftiezer for a follow-up appointment on February 13, 2008. Plaintiff once again complained of continuous GERD despite medications and asked to go to University of Wisconsin Hospital ("UW Hospital") to see a specialist in pain medications. Dr. Hoftiezer denied plaintiff's request and added new medications for plaintiff to try, but he also made a treatment plan to send him to the University of Wisconsin Hospitals and Clinics Gastrointestinal Clinic ("UWGI") if plaintiff received no benefit from the new medication. Plaintiff told Dr. Hoftiezer that he had done enough experimenting and that he wanted pain medication and to go to UW Hospital. But Dr. Hoftiezer said he needed to try all avenues before he could request to send plaintiff to UW Hospital.

Plaintiff saw a nurse practitioner on March 4, 2008, for a cholesterol follow up. Plaintiff was upset that Dr. Hoftiezer was not seeing him and said that he would not do anything about his lipids until Dr. Hoftiezer saw him.

On April 10, 2008, Dr. Hoftiezer saw plaintiff for an examination of his foot and stomach issues. Plaintiff reported constant reflux at night, which triggered his asthma. Plaintiff also complained of severe stomach pain and asked to go to UW Hospital. On exam, Dr. Hoftiezer noted no acute distress and made a plan to request evaluation by the UWGI. Later that day, Dr. Hoftiezer submitted a Class III request for a UWGI appointment to evaluate plaintiff and get suggestions from other physicians on management of plaintiff's GERD. The request was approved the same day.

Plaintiff avers that he would have been treated at UWGI sooner if Dr. Hoftiezer had referred him sooner. However, DOC staff have virtually no ability to control the timing of appointments at the UW Hospitals and Clinics. In Dr. Hoftiezer's experience, non-incarcerated patients often have to wait considerable amounts of time to be treated or

4

evaluated at specialty clinics for non-emergent conditions such as GERD. A wait of 0–3 months for a specialty consult in such a case is not uncommon.

On May 10, 2008, at approximately 1:30 a.m., unit staff called HSU Nurse Mark Oddson and reported that plaintiff had complaints of vomiting all day. Nurse Oddson went to plaintiff's unit to assess him. Plaintiff claimed dizziness and that he had fallen to the floor, but did not remember doing so. He also complained of stomach and back pain and nausea. An ambulance was called and plaintiff was transported to the Waupun Memorial Hospital Emergency Room for further evaluation. An x-ray of plaintiff's abdomen revealed an early or incomplete small bowel obstruction. Dr. Mikkelson performed surgery on plaintiff at Waupun Memorial Hospital that same day. Plaintiff then returned to Dodge. Dr. Hoftiezer accepted Dr. Mikkelson's discharge recommendations and further ordered light duty for 10 days, follow-up for review of need for a UWGI appointment in 10 days, and a copy of the biopsy results from the hospital. The biopsy showed that the mass was a desmoids tumor.

Plaintiff had a follow-up appointment at Waupun Memorial Hospital on May 20, 2008, where staff recommended that plaintiff return to his pre-admission medications, a general diet and no activity restrictions. They said he could return to light duty work in 7 to 10 days and recommended a follow-up with Dr. Mikkelson in 2 to 3 weeks. Again, Dr. Hoftiezer accepted the recommendations and made the orders necessary to follow them. He noted in plaintiff's chart on May 21, 2008, that the pathology showed that plaintiff's abdominal mass was a benign desmoids tumor. Plaintiff saw Dr. Hoftiezer that day and expressed his disappointment that DOC doctors did not know he was having a bowel obstruction.

5

On May 24, 2008, Dr. Hoftiezer ordered light duty and a follow-up appointment with him in four weeks for GERD. On May 27, 2008, Dr. Hoftiezer switched plaintiff's pain medication prescription from vicodin to oxycodone. A nurse treated plaintiff for a surgical drainage issue on May 28, 2008.

Plaintiff saw Dr. Hoftiezer on May 29, 2008, and complained of drainage from his incision and pain. On exam, Dr. Hoftiezer found plaintiff to be in no distress and found his wound to be intact save for a small area by the umbilicus, which had some drainage. Dr. Hoftiezer took a culture of the drainage to check for a possible, but unlikely, infection and affirmed the plan to have plaintiff follow up with Dr. Mikkelson as scheduled, as well as the UWGI physicians to address his GERD.

Dr. Mikkelson saw plaintiff at Waupun Memorial Hospital on June 6, 2008. He noted that plaintiff's abdomen was soft and well healed and made a plan to have a CT scan of the desmoids tumor done in one month and to see plaintiff after that. Dr. Hoftiezer accepted the recommendations of Dr. Mikkelson and ordered no restrictions. He also noted that he was okay for Tylenol for pain. On June 12, 2008, Dr. Hoftiezer ordered a CT scan of plaintiff's abdomen to be scheduled at Waupun Memorial Hospital.

Based on Dr. Hoftiezer's April 10, 2008, referral, plaintiff saw nurse practitioner Patrice Kennedy at the UWGI on June 24, 2008. She examined him and recommended an upper endoscopy to evaluate the results of the 2004 surgery, new medication, unspecified lifestyle modifications, and a follow-up visit after the endoscopy. Dr. Correll accepted Nurse Kennedy's recommendations and ordered the medication changes and follow-up.

6

On June 27, 2008, plaintiff was seen in the HSU. A nurse noted that plaintiff was agitated but did not want to see anyone but Dr. Hoftiezer so no further assessment was done. Plaintiff avers that the nurse and Dr. Correll tried to force plaintiff to sign a refusal of treatment form and to receive treatment from Dr. Correll. Plaintiff avers that Dr. Correll was disrespectful and rude when plaintiff saw him.

Plaintiff wrote a letter to Dittmann on June 27, 2008, asking why he was being passed around and seen by different medical staff for his stomach problems. Plaintiff asked that he not be moved from doctor to doctor and stated that he preferred the doctors at UW Hospital and Dr. Hoftiezer. This was the second time plaintiff had informed Dittmann that he was in pain and receiving inadequate treatment from doctors at Dodge. The first time was an in person conversation on or around December 27, 2007. Dittmann responded to plaintiff's letter on July 1, 2008. She advised him that Dodge had multiple health providers including physicians, nurse practitioners and physicians assistants. It is not unusual for a patient to see different providers during his stay at Dodge. Dittmann informed plaintiff that, in reviewing his medical records and care, it appeared that all of the practitioners had addressed his medical concerns appropriately.

Plaintiff received instruction on preparation for his scheduled CT scan on July 7, 2009. Nurse Last noted that plaintiff continued with severe GERD symptoms and advised plaintiff to tell the doctor at the hospital. She also refilled plaintiff's Tums. The CT scan was performed at Waupun Memorial Hospital on July 8, 2008. The scan showed a 6.5 centimeter rounded but slightly ill-defined soft tissue mass lying within the left mid abdominal region, likely representing the desmoids tumor. The CT scan further showed a single simple cyst within both kidneys.

7

Dr. Mikkelson saw plaintiff on July 11, 2008, for a follow-up on the CT scan of the abdomen and to evaluate the desmoids tumor. Dr. Hoftiezer discussed plaintiff's care plan with Dr. Mikkelson the same day. Dr. Mikkelson indicated that plaintiff did not need further surgery now but recommended that he be evaluated by the UW Surgical Oncology Clinic. Dr. Hoftiezer ordered an EGD (esophagogastroduodenoscopy) be scheduled, an appointment for follow-up of GERD symptoms, and an appointment with the UW Surgical Oncology Clinic regarding the desmoids tumor. He also submitted a Class III request for the endoscopy Nurse Kennedy had recommended, which was approved the same day

On July 16, 2008, Dr. Hoftiezer saw plaintiff to discuss his upcoming consultations regarding the desmoids tumor in his abdomen. Plaintiff told Dr. Hoftiezer that he was having severe stomach pain and that the Tylenol wasn't helping. He also told Dr. Hoftiezer that his acid reflux was still bad and that none of the stomach medications were working or helping any of his stomach problems. Dr. Hoftiezer noted that Dr. Mikkelson had requested the surgical oncology consultation to determine whether further treatment was needed and that it was being arranged. He also noted that plaintiff was being scheduled for an EGD, which is a procedure to examine the esophagus, stomach and small intestine. Dr. Hoftiezer's treatment plan for plaintiff included medications, a wedge or pillows to elevate his head at bedtime and the use of Tylenol as needed for pain.

Plaintiff saw Dr. Hoftiezer on July 28, 2008, and plaintiff reported pain and hard stools. Dr. Hoftiezer noted that plaintiff was scheduled soon for an appointment with a surgical oncologist at UW Hospital and a repeat EGD. Dr. Hoftiezer told plaintiff he needed to give the medications a chance and time to work. Plaintiff responded that he had given them a month and that he was in pain the entire time. He avers that the pain was so severe

that he would cry sometimes. Upon examination, Dr. Hoftiezer concluded that the pain was probably secondary to adhesions and ordered a stool softener and told plaintiff to drink fluids and follow up as needed.

On July 31, 2008, plaintiff saw Dr. Foley at the UW Surgical Oncology Clinic. Dr. Foley recommended a screening colonoscopy to assess for colonic polyps associated with tumors, then a return to the Surgical Oncology Clinic to discuss options within three months.

On August 23, 2008, plaintiff submitted an HSR stating that he was having very serious and sharp internal pain in his stomach. Dr. Hoftiezer responded by giving plaintiff new GERD medications that did not work. He did not give plaintiff any pain medication or see him.

On August 25, 2008, Dr. Hoftiezer submitted a Class III request for a colonoscopy, which was approved the same day. Dr. Hoftiezer then ordered that the screening colonoscopy be scheduled with Dr. Mikkelson at Waupun Memorial Hospital, per Dr. Foley's recommendation.

During an appointment with a nurse on September 3, 2008, plaintiff mentioned that he was having stomach pain. The nurse advised plaintiff to write to Dr. Hoftiezer, and he did, describing sharp pain and soreness and another lump in his stomach. Dr. Hoftiezer responded that plaintiff's specialist appointment was soon and sent antacid, but he did not see plaintiff.

Plaintiff had his screening colonoscopy on September 10, 2008, at Waupun Memorial Hospital. The colon was normal and showed no evidence of polypoid disease. Dr. Hoftiezer ordered that the colonoscopy report be faxed to Dr. Foley.

9

On September 15, 2008, plaintiff was called to the HSU for an examination with Dr. Correll to follow up regarding complaints of abdominal pain. Plaintiff refused to be seen by any physician other than Dr. Hoftiezer, even after staff explained that Dr. Hoftiezer was not available that day. Plaintiff avers that Dr. Hoftiezer told plaintiff to write only to him about his stomach pain and problems.

Plaintiff had an EGD on September 16, 2008, at UW Hospital. Dr. Hoftiezer saw plaintiff on September 19, 2008. Plaintiff complained about the way he was treated and described severe stomach pain and other conditions and discomfort with his stomach. Dr. Hoftiezer said he would talk to Dr. Correll and then confirmed that plaintiff was still having severe GERD. Dr. Hoftiezer noted that the colonoscopy report was unremarkable but that the EGD report showed chronic regurgitation. A patent testing of the esophagus was recommended, and Dr. Hoftiezer noted that this was being scheduled. Plaintiff avers that he was having severe stomach pain and acid reflux, but Dr. Hoftiezer found he was in no acute distress and was pleasant and talkative. Based on this examination, Dr. Hoftiezer made a plan to continue the surgical oncology work-up regarding the desmoids tumor, continue with a gastrointestinal work-up for his severe reflux and continue antacid measures.

Plaintiff saw Nurse Kennedy at the UWGI Clinic on September 23, 2008, for a follow-up on his GERD symptoms. She noted that the recent colonoscopy results and the EGD showed that the Nissen wrap from the 2004 surgery was intact, although a bit loose, but with no evidence of reflux esophagitis or other abnormalities. Nurse Kennedy recommended changes to plaintiff's medications and a follow-up as needed for persistent symptoms. Dr. Hoftiezer accepted and entered Nurse Kennedy's recommendations.

10

On October 6, 2008, plaintiff submitted an HSR about an increase in stomach symptoms. He received a response that he would see Dr. Foley, his UW surgeon, later this month to see about getting these things fixed once and for all. Plaintiff submitted another HSR on October 12, 2008, acknowledging his upcoming appointment with Dr. Foley but asking what he could take to ease the pain because it "hurt like hell" and he still feels the pain when he takes Tylenol. Dr. Williams responded that pain medication would not be appropriate at this time. Plaintiff submitted a third HSR with similar complaints on October 13, 2008, and he was told that this had already been addressed. On October 20, 2008, plaintiff submitted another HSR about his stomach pain and constant gas.

Dr. Hoftiezer saw plaintiff on October 22, 2008, for a routine follow-up of his reflux and desmoids tumor. Dr. Hoftiezer acknowledged that plaintiff was frustrated by the situation, but noted that the examination showed him to be active, laughing and in no distress. Dr. Hoftiezer further noted that his abdomen was tender to palpation in the right and left lower quadrants but there was no guarding, rebound, or rigidity, no masses or organs were palpable, and bowel sounds were normal in both activity and pitch. The diagnosis was GERD and desmoids tumor, and the plan was to continue care with the UWGI Clinic and UW Surgical Oncology Clinic. A medication was added to attempt to diminish spastic abdominal pain, and signs and symptoms of bowel obstruction were reviewed with plaintiff.

Dr. Foley saw plaintiff on October 30, 2008, for a follow-up on the desmoids tumor and possible tightening of the Nissen wrap. Dr. Foley told plaintiff that the desmoids tumor was growing quickly. He recommended referring plaintiff to general surgery to tighten the Nissen wrap. He also ordered a follow-up CT scan of plaintiff's abdomen and pelvis. Dr.

11

Hoftiezer accepted Dr. Foley's recommendations and ordered that plaintiff be referred to general surgery for Nissen repair. He also ordered the follow-up CT scan of plaintiff's abdomen and pelvis. Accordingly to plaintiff, Dr. Foley requested that plaintiff remain at Dodge and under the care of only Dr. Hoftiezer for his gastrointestinal issues.

Plaintiff submitted an HSR on October 31, 2008, regarding his communications with Dr. Foley and advising that Dr. Foley wanted only Dr. Hoftiezer to see plaintiff for his condition so that the two doctors could communicate. The HSR was responded to by an Inmate Complaint Examiner ("ICE") who was also responding to plaintiff's inmate complaint on this issue. Plaintiff submitted another HSR on November 5, 2008, about Dr. Foley wanting plaintiff to be treated only by Dr. Hoftiezer and placing a medical hold on plaintiff until after his surgery. It was again noted that the ICE responded to the issue.

An HSR submitted on November 6, 2008, states again that Dr. Foley told plaintiff to report to Dr. Hoftiezer when he is in pain and suggests that anyone else who interferes with this request is violating the Eighth Amendment by delaying plaintiff's medical treatment and interfering with a doctor's orders. It also stated, "my bottle [sic] of my stomach hurt very bad my intestines are in pain and in flame." (Aff. Scott Hoftiezer, M.D., Exhibit 101, p. 150 ECF No. 69.) Dr. Hoftiezer responded on November 7, 2008: "It is my opinion that there is not a valid medical reason that would prevent other DOC physicians from providing care for you." (Id.) Plaintiff also submitted an interview/information request form and received a response from Dr. Hoftiezer that the issue was responded to on an inmate complaint on November 5, 2008.

Plaintiff submitted an HSR on November 7, 2008, and stated:

12

> Yesterday my stomach was hurting. The pain being at a 8 and my bowel was having a hard time passing. Today I've had 3 bowel movements and still have this pain and I've took antiacid and the other medicine before antiacid. I still have pain the bottom of my stomach blowed and tight so Mr. Hoftiezer what can I do to ease the pain.

(Id. at p. 154.) There is no response to this HSR. There is a notation next to the written response area that appears to be "W/E."

Another undated interview/information request form in the file reads:

> Dr. Hoftiezer on 11-6-08 I wrote about me having serious pain and intestines in flame but you went to a whole nother conversation about who should see me, well, my stomach hurt very bad and I got gas and even after using the bathroom I got pain rated at 8 so now for the record my stomach hurt.

(Id. at p. 155.) There is no response to this request, and the notation "W/E" again appears near the written response section.

Sergeant Heller worked third shift on November 8, 2008, from 11:00 p.m. that day until 6:30 a.m. the following morning. At approximately 4:30 a.m., Heller opened the trap door to plaintiff's cell and found plaintiff over the toilet vomiting. Heller asked plaintiff if he needed medical attention. Plaintiff was having acute stomach pain and responded yes then continued to vomit. Heller called the HSU and then came back and unlocked the cell door. He ordered plaintiff to come into the hallway to wait for HSU staff. Plaintiff could not stand or walk because the pain was so severe. All plaintiff could do was crawl so he crawled while retching vomit and laid on the hallway floor. Heller locked the cell door, and plaintiff continued retching and swallowing his vomit to keep from laying in it. The floor was cold and there was no chair.

13

About eight to ten minutes later, there was a knock on the unit door. LeBreck came down the hall after being let in by Heller. She stood over plaintiff and asked where it hurt. Plaintiff was balled up holding his stomach and could not talk much because when he opened his mouth to talk he had to vomit. During a pause in the vomiting, plaintiff answered that his stomach hurt very back and that he was having another bowel obstruction and was supposed to have a tumor removed at UW Hospital soon. Plaintiff also said that he had written to Hoftiezer three times in the last several days about the stomach pain. The UW surgeon told Dr. Hoftiezer to see plaintiff immediately if he complained of stomach pain.

There was another knock, and Heller went to open the door. Plaintiff heard Nurse Koehler say, "I have his medical chart." Koehler was assigned to work the third shift on November 8, 2008, and she received a call at approximately 4:30 a.m. saying that plaintiff was complaining of abdominal pain. When called to the housing unit to examine an inmate, it is her practice to first locate the inmate's medical chart for a quick review. Koehler mentioned that there were three HSRs to Dr. Hoftiezer complaining of stomach pain. She also noted that plaintiff was recently at UW Hospital on October 30, 2008, and that he had a history of bowel obstructions and acid reflux and that he had stomach surgery in May 2008. Nurse Koehler said that she thought plaintiff was having a bowel obstruction and that he had a stomach tumor that is going to have to be removed. Plaintiff told Koehler, LeBreck and Heller that he had not had a bowel movement in two days and that he had the stomach pain for three days and was not able to eat very much food.

According to Koehler, she checked plaintiff's vital signs and noted that plaintiff had moved easily to the hallway for assessment. Plaintiff informed Koehler that his pain was

14

an 8 out of 10 and that it was "sharp" diffuse abdominal pain which had occurred for the last six to eight hours. On exam, she found that the abdomen was diffusely tender with active bowel sounds in all four quadrants. Plaintiff reported vomiting "phlegm—you know saliva" five times. Plaintiff denied any recent change in appetite or any change in bowel pattern, color or consistency. Plaintiff reported that he had taken APAP and Maalox Plus about 45 minutes prior. Plaintiff further reported that application of cold rags to his abdomen "helps." Koehler found that plaintiff did not have any other symptoms, no chest pain, palpitations or urinary difficulty, and that his vital signs were stable.

Koehler encouraged plaintiff to increase fluids, continue to apply cool rags as needed, and to use APAP and Maalox as ordered. Koehler advised plaintiff to report any blood in his stool, vomiting something other than phlegm, or abdomen distention immediately. She also made a plan to have the morning HSU nurse follow up with plaintiff.

Plaintiff avers that LeBreck said, "There's nothing we can do and I am going home in half hour, let first shift deal with him, put him back in his cell." (Aff. Keith Jackson 1, ECF No. 82.) Based on Koehler's exam, she made the decision to have the morning nurse follow up. Koehler says she did not believe at that time that plaintiff needed to be transported to the emergency room. Plaintiff displayed no signs of an acute abdomen at the time of the assessment, and Koehler's findings indicated a need for patient education and routine HSU follow up. Koehler did not order plaintiff moved to a different cell or unit and did not order that plaintiff be sent off-site for medical treatment, so he was returned to his cell. Plaintiff says he crawled back into his cell on hands and knees and continued vomiting.

15

Heller is not a physician and cannot order medical care and treatment. Heller does not and is not qualified to provide medical services to inmates at Dodge. Heller has no supervisory control over HSU employees, nor does he have any control over or input into their diagnostic and treatment decisions. Heller did not call an emergency medical technician or an ambulance. He relied on Koehler's assessment of plaintiff's condition and her conclusion that emergency services were not needed.

LeBreck does not recall the incident on November 9, 2008. If LeBreck was on the unit on November 9, 2008, she would have been responsible for assisting Koehler by retrieving anything she needed. LeBreck does not have the authority to override the decisions of the HSU physicians or nurses about an inmate's health care diagnoses or treatment needs.

When the first shift sergeant came in at 6:00 a.m. count, he heard plaintiff still vomiting, opened the trap on the cell door and told plaintiff to get his greens on because he was going to HSU. Plaintiff's cell mate told the sergeant that plaintiff had been vomiting all night and about the nurse coming down. Plaintiff was seen by the morning HSU nurse at approximately 7:00 a.m. Nurse William Smith noted that plaintiff's signs and symptoms remained the same with continued hot and cold flashes, complaints of abdominal pain, diarrhea and dizziness. Plaintiff reported that he was unable to walk and that he was dry heaving. Nurse Smith checked plaintiff's vital signs and noted that plaintiff's abdomen was rigid and tender. Plaintiff was sent to the emergency room at Waupun Memorial Hospital.

Waupun Memorial Hospital transferred plaintiff to UW Hospital for further evaluation. There, he was admitted by a surgical oncologist, Dr. Gregory Kennedy. On November 12, 2008, Dr. Kennedy performed surgery on plaintiff to resect the desmoids

16

tumor, which was causing a bowel obstruction. Plaintiff returned to Dodge on November 19, 2008, and Dr. Hoftiezer accepted the discharge recommendations of Dr. Kennedy and ordered them carried out. Dr. Hoftiezer saw plaintiff for post-operative follow up appointments on November 20, November 24 and November 28. Plaintiff was transferred to the Wisconsin Secure Program Facility on December 3, 2008. Plaintiff was seen for medical evaluations by HSU staff approximately 41 times while confined at Dodge between August 15, 2007, and December 3, 2008.

## II. DISCUSSION

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

In Duckworth v. Ahmad, 532 F.3d 675, 678-79 (7th Cir.2008), the Seventh Circuit set forth the legal standard for Eighth Amendment medical care claims:

> The states have an affirmative duty to provide medical care to their inmates. Estelle v. Gamble, 429 U.S. 97, 103, 97 S. Ct. 285, 50 L.Ed.2d 251 (1976). And the upshot of this duty is that the "deliberate indifference to [the] serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain'" and violates the Eighth Amendment's prohibition against cruel and unusual punishments. Id. at 104, 97 S. Ct. 285. To state a cause of action, a plaintiff must show (1) an objectively

17

serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent. <u>Sherrod v. Lingle</u>, 223 F.3d 605, 610 (7th Cir.2000).

Defendants concede that plaintiff suffered from serious medical needs, including GERD and his desmoids tumor. Consequently, I must then consider whether each defendant was deliberately indifferent to plaintiff's serious medical needs during the course of his treatment.

> Deliberate indifference is a subjective standard. <u>Johnson</u>, 444 F.3d at 585. To demonstrate deliberate indifference, a plaintiff must show that the defendant "acted with a sufficiently culpable state of mind," something akin to recklessness. Id. A prison official acts with a sufficiently culpable state of mind when he knows of a substantial risk of harm to an inmate and either acts or fails to act in disregard of that risk. <u>Roe</u>, 631 F.3d at 857. Deliberate indifference "is more than negligence and approaches intentional wrongdoing." <u>Collignon v. Milwaukee Cnty.</u>, 163 F.3d 982, 988 (7th Cir.1998). In other words, "[d]eliberate indifference is not medical malpractice; the Eighth Amendment does not codify common law torts." <u>Duckworth v. Ahmad</u>, 532 F.3d 675, 679 (7th Cir.2008). "A jury can infer deliberate indifference on the basis of a physician's treatment decision [when] the decision [is] so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." <u>Id.</u> (quotation marks omitted). A plaintiff can show that the professional disregarded the need only if the professional's subjective response was so inadequate that it demonstrated an absence of professional judgment, that is, that "no minimally competent professional would have so responded under those circumstances." <u>Roe</u>, 631 F.3d at 857 (quotation marks omitted).

<u>Arnett v. Webster</u>, 658 F.3d 742, 751 (7th Cir.2011).

## A. Dr. Scott Hoftiezer

I have reviewed and recited at length the medical care Dr. Hoftiezer provided to plaintiff at Dodge in 2008. "A medical professional acting in his professional capacity may

18

be held to have displayed deliberate indifference only if the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person did not base the decision on such a judgment." Roe v. Elyea, 631 F.3d 843, 857 (7th Cir.2011). A prisoner does not, however, need to show that he was literally ignored, and some treatment does not foreclose a deliberate indifference claim. Arnett, 658 F.3d at 751 (citing Greeno v. Daley, 414 F.3d 645, 653 (7th Cir.2005)).

Plaintiff complained of severe stomach pain at almost every appointment with Dr. Hoftiezer, and, except for the short time in May 2008 when plaintiff had narcotic pain medications after surgery, Dr. Hoftiezer never gave plaintiff a pain medication stronger than Tylenol. "A prison physician cannot simply continue with a course of treatment that he knows is ineffective in treating the inmate's condition." Arnett, 658 F.3d at 754 (citing Greeno, 414 F.3d at 655). Although it is possible that Dr. Hoftiezer was hoping the changing medications would resolve the underlying conditions causing plaintiff's pain, a reasonable jury could conclude that it was deliberate indifference to not address plaintiff's pain.

Additionally, plaintiff argues that Dr. Hoftiezer should have sent plaintiff to a specialist sooner. This could be viewed as a disagreement with a medical professional about treatment needs, which cannot sustain an Eighth Amendment. See Ciarpaglini v. Saini, 352 F.3d 328, 331 (7th Cir.2003). But plaintiff was left in pain for months while Dr. Hoftiezer exhausted all of his options before making Class III referrals. This could lead a reasonable jury to conclude that it was deliberate indifference to wait so long to refer plaintiff to a specialist. See Smith v. Knox County Jail, 666 F.3d 1037, 1040 (7th Cir. 2012)

19

("[D]eliberate indifference to prolonged, unnecessary pain can itself be the basis for an Eighth Amendment claim.").

## B. Beth Dittmann

Plaintiff avers that he informed Dittmann twice that he was in pain and receiving inadequate treatment from doctors at Dodge. He told her in person in December 2007, and he wrote a letter on June 27, 2008. It appears from the record of plaintiff's medical care that his treating physician changed after the December 2007 conversation. Then, when Dittmann received plaintiff's letter, she reviewed his medical records and provided him with general information about the HSU's multiple providers and a specific opinion that it appeared all of the practitioners had addressed his medical concerns appropriately. There is nothing in the conduct described that suggests Dittmann was deliberately indifferent to plaintiff's serious medical needs or his concerns about his treatment. She is entitled to summary judgment.

## C. Nurse Jane Koehler and CNA Kim LeBreck

Viewing the evidence in the light most favorable to plaintiff, I cannot grant summary judgment in favor of defendant Koehler or LeBreck. Plaintiff's account of his pain and appearance in the early morning hours of November 9, 2008 is dramatic. The quote he attributes to LeBreck is shocking and callous, as is the possibility that Nurse Koehler went along with LeBreck's sentiments and left plaintiff to suffer until the first shift staff could deal with him.

20

**D. Sergeant Heller**

With regard to plaintiff's claim against Heller, non-medical personnel are entitled to rely on the expertise of medical personnel. <u>Arnett</u>, 658 F.3d at 755; <u>Greeno</u>, 414 F.3d at 656. Heller contacted HSU as soon as he discovered plaintiff's medical emergency around 4:30 a.m. on November 9, 2008. From that point forward, Heller was entitled to rely on the medical decision made by Nurse Koehler. Therefore, I will grant summary judgment in his favor.

**E. Counsel**

I have previously denied plaintiff's motion to appoint counsel. At that time, he was competent to litigate the case. He conducted discovery and filed motions and responded thoroughly to defendants' motion for summary judgment. Now, however, with Eighth Amendment medical care claims against Dr. Hoftiezer, Nurse Koehler and CNA LeBreck proceeding to trial, I believe the difficulty of trying this case exceed's plaintiff's capacity as a layperson to coherently present it. <u>See</u> <u>Navejar v. Iyiola</u>, 718 F.3d 692, 696 (7th Cir. 2013). Thus, I will recruit pro bono counsel to represent plaintiff.

**THEREFORE, IT IS ORDERED** that defendants' motion for summary judgment (Docket #66) is **GRANTED IN PART and DENIED IN PART**.

**IT IS FURTHER ORDERED** that Beth Dittmann and Sgt. Heller are **DISMISSED WITH PREJUDICE** as defendants to this action.

Dated at Milwaukee, Wisconsin, this 10th day of September, 2013.

s/ Lynn Adelman

_____
LYNN ADELMAN
District Judge

21